# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

AMERICAN MEDICAL SECURITY, INC., and
UNITED WISCONSIN LIFE INSURANCE COMPANY,

        Plaintiffs,

    v.                                Case No. 02-C-1205

EXECUTIVE RISK SPECIALTY
INSURANCE COMPANY,

        Defendant.

---

## DECISION AND ORDER

---

        Plaintiffs American Medical Security, Inc., and United Wisconsin Life Insurance Company (collectively "AMS") filed this action against Executive Risk Specialty Insurance Company in Brown County Circuit Court, on November 7, 2002. AMS sought monetary damages for breach of contract and a declaratory judgment that Executive Risk had violated the terms of an insurance policy issued to AMS by failing to pay AMS' legal costs and refusing to pay damages AMS had incurred in a Florida case. Executive Risk removed the case to this court, alleging diversity jurisdiction under 28 U.S.C. § 1332. Thereafter AMS amended its complaint to include similar allegations with respect to thirty-eight other cases in Alabama, Louisiana, Mississippi, and Wisconsin. Executive Risk filed a counterclaim against AMS seeking reimbursement of defense expenses it advanced to AMS in the Florida case and a declaration that neither defense nor indemnity coverage existed in any of the other cases. Currently before the court are the parties'

cross-motions for summary judgment. For the reasons stated herein, each motion will be granted in part and denied in part.

## BACKGROUND

AMS underwrites, markets and administers health insurance in various states throughout the country. (Pls.' PFOF [74] ¶ 1-3.) On September 25, 1998, AMS purchased a Managed Care Errors and Omissions Liability Policy from Executive Risk. (Pls.' PFOF [74] ¶ 3.) AMS later purchased three more policies, the last of which expired on December 21, 2002. (Pls.' PFOF [74] ¶¶ 4-6; Def.'s PFOF [70] ¶¶ 5-8.) The policies were claims-made policies, meaning that they provided coverage for claims made against AMS within their policy periods, even if the wrongful acts that gave rise to the claims occurred before the policies' inception date. (Def.'s PFOF [70] ¶ 9.) The policies permitted AMS to retain its own defense counsel in the event of a claim and obligated Executive Risk to reimburse AMS' defense costs on a current basis. (Pls.' PFOF [74] ¶ 4; Def.'s PFOF [70] ¶¶ 10, 14-15.)

On February 10, 2000, certain current and former insureds of AMS filed a class-action suit ("*Addison*") against AMS in the Palm Beach County (Florida) Circuit Court. (Borja Decl., [69] Ex. 9A.) The *Addison* plaintiffs alleged that they had purchased group health insurance policies from AMS, but that AMS had cancelled their policies on their 1999 renewal dates and had offered them inferior coverage with sharply higher premiums thereafter.[1] (*Id.*) More specifically, the plaintiffs alleged:

---

[1]While the plaintiffs each had different 1999 renewal dates, the complaint alleges that AMS notified all the plaintiffs of the cancellation by letter dated September 25, 1998. (Borja Decl., [69] Ex. 9A at 10048, 10050, 10051, 10052.)

In furtherance of an on-going, established policy and practice designed to maximize profits by eliminating or increasing premiums to customers who required substantial health care after they became AMS subscribers, AMS decided in 1998 to cancel many of the group plans it had previously provided – and which were guaranteed to be renewed at the option of the subscriber – and to force subscribers with poor medical histories to take an alternative plan with substantially higher premiums. In effect, AMS took one pool of subscribers who had been sold a particular form of insurance as part of a group plan and then split the group into new pools base on their individual health status. The primary goal of this tactic was to force these insured[s] with poor medical histories to drop their coverage or, at least, to pay substantially more for a less beneficial policy. Because many of the affected subscribers had become uninsurable as a result of their medical histories, they had no choice but to accept the extortionate premiums offered by AMS or to go without insurance at all.

(*Id.* ¶ 2.) The class representatives sought damages for breach of contract, violation of the Florida Consumer Protection Act, and fraud, as well as equitable remedies and a declaration that AMS had violated Florida law by basing premium increases on their individual claims histories and by providing improper notification of conversion rights, issuance of conversion policies, and computation of premiums. (*Id.*)

On May 22, 2000, the plaintiffs filed an amended complaint. (Borja Decl., [69] Ex. 9B.) The amended complaint alleged that the plaintiffs had purchased group health insurance policies from AMS, and that throughout the life of those policies, AMS had "individually re-underwrit[ten] each insured on the basis of claim experience/health status." (*Id.* at 10089.) The amended complaint also repeated in summary form the allegations of the original complaint. (*Id.* at 10084-5.) The amended complaint sought only contractual damages and equitable relief. (*Id.* at 10087-94.) Specifically, the plaintiffs contended that their group health insurance policies incorporated certain Florida statutes, that the policies did not comply with those statutes, and that the noncompliance amounted to a breach of contract by AMS. (*Id.*)

On April 24, 2002, following a bench trial, the *Addison* court entered a final judgment against AMS on the issue of liability. (Def.'s PFOF [70] ¶ 33.) The court found that AMS had violated Fla. Stat. § 627.65625, "which prohibits discrimination against individual participants and beneficiaries based on health status,"[2] as well as other Florida statutes. (Borja Decl., [69] Ex. 13 at 10438.) In a thirty-seven page written decision, much of which was devoted to the question of whether the policies sold by AMS were exempt from the relevant provisions of the Florida Insurance Code as out-of-state group health insurance policies, the Florida court found that AMS had "engaged in annual re-underwriting 'tier rating' in 1993 through 1997 and from 1999 until the

---

[2]The statute provides that

an insurer that offers a group health insurance policy may not establish rules for eligibility, including continued eligibility, of an individual to enroll under the terms of the policy based on any of the following health-status-related factors in relation to the individual or a dependent of the individual:

(a) Health status.

(b) Medical condition, including physical and mental illnesses.

(c) Claims experience.

(d) Receipt of health care.

(e) Medical history.

(f) Genetic information.

(g) Evidence of insurability, including conditions arising out of acts of domestic violence.

(h) Disability.

Fla. Stat. § 627.65625.

present time."[3] (*Id.* at 10423.) The court noted that under this system, individual insureds were re-underwritten each year, with those who developed medical problems placed in substandard tiers where their premiums were raised as much as sixty percent according to some witnesses, while those who had not made any claims had no premium increase or at most a five percent increase. Such a practice, the court noted, "defies the very purpose of group health insurance," which is to "spread and share the risk among a group of insureds." (*Id.* at 10422-23.) Not only did the Florida court conclude that this practice violated Florida law, it also found that in 1996 the Florida Department of Insurance (DOI) had disapproved a proposed rate filing by AMS under which it intended to base renewal premiums for individual members on that member's "health risk assessment" and ordered it to "cease and desist from such conduct." (*Id.* at 10416; Borja Decl., [69] Ex. 88.)

AMS notified Executive Risk of the *Addison* claims in October 2000. (Pls.' PFOF [74] ¶ 8.) By letters dated June 5, 2001, December 26, 2001, and February 28, 2002, Executive Risk reserved its rights under the policies. (Pls.' PFOF [74] ¶¶ 9,12,14; Def.'s PFOF [70] ¶ 30.) On January 3, 2002, Executive Risk advanced $797,033.97 to AMS for defense expenses to date. (Def.'s PFOF [70] ¶ 31.) Shortly thereafter, Executive Risk learned of the previous DOI proceeding and declined coverage for *Addison* on March 13, 2002. (Pls.' PFOF [74] ¶ 16.) On September 23, 2004, *Addison* settled. (Def.'s PFOF [70] ¶ 34.) However, *Addison* was only the beginning of a

---

[3]The court referred to this as "tier rating." (Borja Decl., [69] Ex. 13 at 10416 n.4.) While the parties dispute the proper meaning of the term "tier rating," this court will use it in the same sense that the Florida court used it.

5

wave of litigation against AMS. Also at issue in this case are thirty-eight other suits–thirty in Alabama, five in Mississippi, two in Louisiana, and one in Wisconsin. The allegations in these suits are broadly similar to the allegations in the original and/or amended *Addison* complaints.

## DISCUSSION

Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Wantz v. Experian Information Sol.*, 386 F.3d 829, 832 (7th Cir. 2004); Fed. R. Civ. P. 56. Summary judgment can be particularly appropriate in contract actions where the disposition of the case involves the interpretation of a contract. *Tingstol Co. v. Rainbow Sales Inc.*, 218 F.3d 770, 771-72 (7th Cir. 2000).

Under Wisconsin law, the construction of a contract is a question of law.[4] *Elkhart Lake's Road Amer. Inc. v. Chicago Hist. Races, Ltd.*, 158 F.3d 970, 972 (7th Cir. 1998). Judicial interpretation of a contract, including an insurance policy, seeks to determine and give effect to the intent of the contracting parties. *Wisconsin Label Corp. v. Northbrook Property & Cas. Ins. Co.*, 607 N.W.2d 276, 282 (Wis. 2000). Insurance polices are construed as they would be understood by a reasonable person in the position of the insured. *Kremers-Urban Co. v. American Employers Ins. Co.*, 351 N.W.2d 156, 163 (Wis. 1984). However, an insurance policy should not be construed

---

[4]The parties have briefed the case on the assumption that Wisconsin law applies. Under these circumstances, the district court applies the law of the State in which it sits. *Employers Ins. of Wausau v. Bodi-Wachs Aviation*, 39 F.3d 138, 141 n.2 (7th Cir. 1994).

6

to provide coverage for risks that the insurer did not underwrite and for which it has not received a premium. *Wisconsin Label*, 607 N.W.2d at 283.

These principles were recently recounted by the Wisconsin Supreme Court in *American Family Mut. Ins. Co. v. American Girl, Inc.,* 673 N.W.2d 65, 73 (Wis. 2004). The *American Girl* court noted that in determining whether coverage exists under a particular policy, Wisconsin courts follow a three-step procedure:

> First, we examine the facts of the insured's claim to determine whether the policy's insuring agreement makes an initial grant of coverage. If it is clear that the policy was not intended to cover the claim asserted, the analysis ends there. If the claim triggers the initial grant of coverage in the insuring agreement, we next examine the various exclusions to see whether any of them preclude coverage of the present claim. Exclusions are narrowly or strictly construed against the insurer if their effect is uncertain . . . . We analyze each exclusion separately; the inapplicability of one exclusion will not reinstate coverage where another exclusion has precluded it. Exclusions sometimes have exceptions; if a particular exclusion applies, we then look to see whether any exception to that exclusion reinstates coverage. An exception pertains only to the exclusion clause within which it appears; the applicability of an exception will not create coverage if the insuring agreement precludes it or if a separate exclusion applies.

*American Girl, Inc.*, 673 N.W.2d at 73 (citations omitted). In this case, the policies provide a broad initial grant of coverage: Executive Risk "will pay on behalf of [AMS] any Loss which [AMS] is legally obligated to pay as a result of any Claim that is first made against [AMS] during the Policy Period or during any applicable Extended Reporting Period." (Def.'s PFOF [70] ¶ 11.) AMS' claims trigger an initial grant of coverage; accordingly the court turns its attention to the exclusions and other limitations on coverage.

## I. The Prior and Pending Proceeding Exclusion

Executive Risk first advances an argument that would, if successful, resolve this case. It maintains that coverage for *Addison* and the other thirty-eight suits is barred by the prior and pending proceeding exclusion in the policy, which states that Executive Risk

shall not pay any Loss, including Defense Expenses, from any Claim . . . based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event, Wrongful Act or series of facts, circumstances, situations, transactions, events or Wrongful Acts:

(a) underlying or alleged in any litigation or administrative or regulatory proceeding brought prior to and/or pending as of the Inception Date stated in ITEM 2(a) of the Declarations:

(I) to which any Insured is or was a party; or

(ii) with respect to which any Insured, as of the Inception Date, knew or should reasonably have known that an Insured might be made a party thereto

(Def.'s PFOF [70] ¶ 16.)  Executive Risk argues that the 1996 proceeding before the Florida Department of Insurance was an "administrative or regulatory proceeding brought prior to and/or pending as of the Inception Date."  If that is so, there is no coverage in the event *Addison* involves "any fact, circumstance, situation, transaction, event, Wrongful Act or series of facts, circumstances, situations, transactions, events or Wrongful Acts" underlying or alleged in the 1996 proceeding.

AMS argues that the Inception Date–given as September 25, 1998, in all the policies–was changed to January 1, 1983 (the date that AMS was incorporated) by a "Retroactive Date" contained in the 1999-2000, 2000-2001, and 2001-2002 policies.  (Pls.' PFOF [74] ¶ 6.)  Since the DOI matter took place long after that date, AMS contends the exclusion cannot possibly apply.  Executive Risk counters that the Retroactive Date operates as an independent limitation on coverage, barring claims for wrongful acts that occurred before January 1, 1983, regardless of when claims arising out of those acts were made, but having no effect on the Inception Date.  Because the DOI proceeding took place before the Inception Date, Executive Risk argues the exclusion applies.

8

The policies are admittedly vague as to the operation of the Retroactive Date.[5]  However, they are quite clear that the relevant date for the prior and pending proceeding exclusion is the Inception Date.  Nothing in the policies indicates that the Retroactive Date modifies the Inception Date.  To the contrary, Endorsement No. 9, which changes the Retroactive Date to the date of incorporation, states that "[a]ll other terms, conditions and limitations of this Policy shall remain unchanged."  (Borja Decl., [69] Ex. 5 at 000036.)

Executive Risk's position also finds support in *ML Direct, Inc. v. TIG Specialty Ins. Co.*, 93 Cal. Rptr. 2d 846 (Cal. Ct. App. 2000).  The policy at issue in that case had a prior and pending proceeding exclusion, an inception date of March 11, 1997, and a retroactive date of June 22, 1995.  The court found that proceedings initiated on September 18, 1996 and February 14, 1997, were prior proceedings arising out of the same facts as a suit filed on June 27, 1997, which was tendered to the insurer for coverage.  The court held that the policy's retroactive date meant that it provided coverage for acts occurring after June 22, 1995, provided no proceedings arising out of those acts were initiated prior to March 11, 1997.  *Id.* at 853.  This court likewise concludes that the Retroactive Date does not modify the Inception Date.  It therefore follows that the claims against AMS are excluded if they are based on, arise out of, directly or indirectly result from, are in

---

[5]Executive Risk's explanation of its operation is well-supported by case law, though.  *See, e.g., Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 771 (1993) ("[A] 'retroactive date' provision . . . restrict[s] coverage to claims based on incidents that occurred after a certain date.  Such a provision eliminates the risk that an insurer, by issuing a claims-made policy, would assume liability arising from incidents that occurred before the policy's effective date, but remained undiscovered or caused no immediate harm."); *National Cycle, Inc. v. Savoy Reins. Co.*, 938 F.2d 61, 62 (7th Cir. 1991) ("Insurers asked to issue claims-made policies protect themselves against liability for old occurrences by including a "retroactive date," specifying the earliest occurrence to be covered, no matter when the claim is made.").  Executive Risk's explanation also draws support from the deposition testimony of Susan Huntington, Executive Risk's underwriter.  (11/22/04 Borja Decl., [86] Ex. 1.)

consequence of, or in any way involve any fact, circumstance, situation, transaction, event, Wrongful Act or series of facts, circumstances, situations, transactions, events of Wrongful Acts that underlay or were alleged in any judicial, administrative or regulatory proceeding brought prior to and/or pending as of September 25, 1998. Since the DOI matter occurred prior to that date, it is to that matter that the court now turns.

The 1996 DOI matter involved proposed "Med One Generic Renewal Guidelines." (Borja Decl., [69] Ex. 87 at 30389; Ex. 88 at 007496-7.) AMS filed the proposed Guidelines with the Florida Department of Insurance, and explained in its subsequent correspondence with the DOI that under the proposed Guidelines, "[b]oth new business and renewals [would be] underwritten using 'a health risk assessment' whereby the insured [would be] placed into one of four possible risk categories." (Borja Decl. [69] Ex. 88 at 007492.) The DOI disapproved the proposed Guidelines on January 19, 1996, stating that "[t]he tier rating described in Exhibit G attached to your January 12, 1996, letter is considered to be an Unfair Practice in accordance with F.S.626.9541." (Borja Decl., [69] Ex. 87 at 30392.) The DOI also stated the rating practice described was prohibited under Florida administrative regulations. (*Id.*) As AMS later admitted, "the sole basis for the disapproval was the 'tier-rating' renewal process outlined in [the proposed Guidelines]." (Borja Decl., [69] Ex. 93 at 007391.) In addition to disapproving the proposed Guidelines, the DOI "request[ed] confirmation that the practices described under the [proposed Guidelines] are not being used and have not been used in Florida," stating that "[i]f this is not the situation, Florida will commence withdrawal of approval proceedings for the program encompassed in the above referenced filing." (Borja Decl., [69] Ex. 87 at 30392.) On February 9, 1996, AMS requested a "formal administrative proceeding" to dispute the disapproval. (*Id.* at 30388.) However, AMS later withdrew the

10

offending portion of the proposed Guidelines. (Borja Decl., [69] Ex. 93.) It is unclear whether AMS ever responded to the request for confirmation, and it appears that the proposed Guidelines never went into effect.

Executive Risk argues that *Addison*, as well as the thirty-eight re-underwriting lawsuits brought in other states, "involve the same re-underwriting practices that the DOI had disapproved and that were the subject of the 1996 administrative proceeding." (Executive Risk Br. [68] at 18.) Given the broad language of the prior/pending proceeding exclusion, Executive Risk contends coverage is clearly barred under the circumstances of this case. All of the cases for which AMS seeks coverage, Executive Risk contends, arise out of, are based upon, or directly or indirectly involve the same underwriting practice that was the subject of the 1996 DOI proceeding.[6]

Executive Risk makes much of AMS' admission that *Addison*, like the 1996 proceeding, "involv[es] re[-]underwriting and/or tier rating." (Pls.' PFOF [74] ¶ 26.) Broadly speaking, that is true, but *Addison* does not involve the same re-underwriting/tier rating that was at issue in the 1996 proceeding. The 1996 proceeding involved proposed tier rating Guidelines that were apparently never adopted. *Addison* involved the actual tier rating practices that AMS was apparently engaged in both before and after the 1996 proceeding. These are two different "facts, circumstances, situations, transactions, events or Wrongful Acts." While the underwriting practices at issue in *Addison* may have been similar to the proposed guidelines at issue in the 1996 matter, the exclusion requires that the facts, circumstances, situations, transactions, events or Wrongful

---

[6]Executive Risk does not claim that coverage is precluded under the "known loss" doctrine. *See State v. Hydrite Chemical Co.*, 2005 WI App 60, 695 N.W.2d 816; *see also* Arnold P. Anderson, *Wisconsin Insurance Law* § 5.45 (5th ed. 2004) ("[I]nsurance does not cover losses the policyholder knows of, planned, intended, or is aware are substantially certain to occur.").

Acts involved in the claim be the same as those underlying or alleged in the prior proceeding. If Executive Risk wanted to exclude coverage for claims based upon underwriting policies and practices that were similar to policies or practices that had been involved in prior or pending proceedings, it should have said so clearly in its policy. It did not.

In arguing that the prior/pending proceeding exclusion applies, Executive Risk relies principally upon the broad language of the exclusion. It is true that the language of the exclusion is extremely broad. It applies to any loss "based on, arising out of, directly or indirectly resulting from, in consequence of, *or in any way involving* any fact, circumstance, situation, transaction, event, Wrongful Act or series of facts, circumstances, situations, transactions, events or Wrongful Acts . . . underlying or alleged in any litigation or administrative or regulatory proceeding brought prior to and/or pending as of the inception date" of the policy. (Def.'s PFOF [70] ¶ 16.) (emphasis added). Taken literally, this language would exclude coverage for any and all claims if AMS was involved in any judicial, administrative or regulatory proceeding prior to the inception date of the policy since any such proceeding would at least "involve" the "fact" that AMS sold insurance. A literal reading of the exclusion would thus render the policy illusory for any insured who had ever been sued and must be rejected under basic principles of insurance policy construction. *See Hoglund v. Secura Ins. Co.*, 500 N.W.2d 354, 356 (Wis. App. 1993).

The Wisconsin Supreme Court has noted that "[w]ords and phrases in an insurance policy are ambiguous when they are so imprecise and elastic as to lack any certain interpretation." *Frost ex rel. Anderson v. Whitbeck*, 654 N.W.2d 225, 230 (Wis. 2002). By that standard, the prior/pending proceeding exclusion is ambiguous. As explained by the Court in *Whitbeck*,

> [i]f terms in an insurance policy are ambiguous, they should be construed against the insurance company that drafted the policy. Thus, ambiguous terms are to be construed in favor of coverage, and exclusions are to be narrowly construed against

an insurer. Language in an insurance policy is construed as understood by a reasonable person in the position of an insured rather than as intended by the insurer. The reasonable expectations of coverage of an insured should be furthered by the interpretation given.

*Id.* (citations omitted). Applying these principles to the facts of this case, the court concludes that the prior/pending proceedings exclusion does not apply to *Addison*.

Executive Risk cites no case supporting the proposition that a prior and pending proceeding exclusion may bar coverage for claims that bear a mere typological relationship to the prior or pending proceeding. The exclusion may bar coverage where the second proceeding alleges different consequences of the wrongful acts involved in the first proceeding. *See Ameriwood Indus. Int'l Corp. v. Am. Cas. Co.*, 840 F. Supp. 1143 (W.D. Mich. 1993). The exclusion may also bar coverage where the second proceeding applies different legal theories or prayers for relief to the wrongful acts alleged in the first proceeding. *See Bensalem Township v. Int'l Surplus Lines Ins. Co.*, 1992 WL 142024 (E.D. Pa. June 15, 1992), *rev'd on other grounds*, 38 F.3d 1303 (3d Cir. 1994). However, the only case adduced by Executive Risk in which the second proceeding arguably involved different wrongful acts is *Zunenshine v. Executive Risk Indem., Inc.* 1998 WL 483475 (S.D.N.Y. Aug. 17, 1998). The two proceedings at issue in *Zunenshine* involved different misstatements, albeit about the same topics: a company's net income during the first three quarters of 1993, the percentage of its sales spent on television advertising, and the effect that a trademark infringement action had had on its financial condition. *Id.* at *2. Nevertheless, the court held that the prior and pending proceeding exclusion applied:

Nothing in the Policy requires that a claim involve precisely the same . . . "Wrongful Acts" . . . for the "pending lawsuit" . . . exclusion[] to apply. Indeed, [the exclusion is] phrased in the disjunctive, that is, a claim is excluded if it arises out of "any fact,

13

circumstance, situation, transaction, event *or* Wrongful Act" alleged in a pending lawsuit.

*Id.* at *5 (emphasis in original). While this analysis may appear puzzling, the Second Circuit, in affirming, identified the common "fact, circumstance, transaction, event or Wrongful Act" between the two proceedings:

> The same series of underestimations (whether it be considered a "fact, circumstance, situation, transaction, event or Wrongful Act") underlay [both lawsuits.] It is [therefore] immaterial that the underestimations were conveyed to the [claimants in the later action] and the [claimants in the prior action] in somewhat different forms (private communications vs. public disclosures)[.]

*Zunenshine v. Executive Risk Indem., Inc.*, 1999 WL 464988, at *1-2 (2d Cir. June 29, 1999). Executive Risk has identified no common fact, circumstance, situation, transaction, or wrongful event underlying the 1996 proceeding and *Addison*. It has merely shown that *Addison* involves the same *type* of wrongful act–tier rating–as the 1996 proceeding. Without more, this cannot bar coverage for *Addison*.

For similar but more emphatic reasons, the court cannot conclude on the record before it that the prior and pending proceeding exclusion bars coverage for the other thirty-eight cases. Thirty of these cases were litigated in Alabama, five in Mississippi, two in Louisiana, and one in Wisconsin. The court cannot even determine whether the plaintiffs in the other thirty-eight suits were participants in the MedOne product to which the 1996 filing pertained. Twelve of the Alabama cases clearly involve a "MedOne" policy,[7] and three others appear to involve such a

---

[7]The complaints and/or settlement agreements in *Saucier* and *McLeod* (Borja Decl., Exs. 16-38), *Jackson* 98-103 and *Jackson* 02-83(Borja Decl., Ex. 42), *Fabritis* (Borja Decl., Exs. 44-45), *Gadson* (Borja Decl., Exs. 46-48), *Lockett* (Borja Decl., Exs. 49-50), *Stuart* (Borja Decl., Exs. 51-52), *Noland* (Borja Decl., Ex. 54), *Cappadocia* (Borja Decl., Exs. 55-56), *Helms* (Borja Decl., Ex. 57), and *McCreary* (Borja Decl., Ex. 77) refer to the policy at issue as a "MedOne" policy.

14

policy.[8]  However, it is unclear whether the Alabama "MedOne" policy is the same policy as the Florida "MedOne" policy at issue in the 1996 proceeding.  It is unclear what policies the remaining cases involve.[9]  In any event, for the reasons stated above, the court concludes that the prior/pending proceedings exclusion does not apply.

## II.  The Related Claims Provision

The parties dispute not only whether coverage exists for the claims made against AMS, but also the amount of coverage available.  The policies provide that "[a]ll Related Claims, whenever made, shall be deemed to be a single Claim and shall be deemed to have been first made on . . . the date on which the earliest Claim within such Related Claims was received by an Insured."  (Def.'s PFOF ¶ 21.)  The policy defines "Related Claims" as

> all Claims for Wrongful Acts based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions, or events or the same or related series of facts, circumstances, situations, transactions, or events whether related logically, causally, or in any other way.

(Def.'s PFOF ¶ 20.)  The number of claims at issue in this case may affect Executive Risk's total limit of liability.  (Def.'s PFOF ¶¶ 22-23.)  If all of the claims are found to be related, all are covered by the 1999-2000 policy and are subject to that policy's aggregate limit.

---

[8]The complaints in *Hicks* (Borja Decl., Ex. 41), *Wadsworth* (Borja Decl., Exs. 61-62), and *Robinson* (Borja Decl., Ex. 63) refer to "Master Policy AB 2000," a reference that also appears in the complaints involving a "MedOne" policy.

[9]One of the Alabama cases, four of the Mississippi cases, and the Wisconsin case appear to involve "MedOne Choice" policies.  The complaints in *Keller* (Borja Decl., Exs. 58-59), *Reed* (Borja Decl., Ex. 64), *Sykes* (Borja Decl., Ex. 65), *Hudson* (Borja Decl., Ex. 66), *Fortson* (Borja Decl., Ex. 68), and *Langenfeld* (Borja Decl., Ex. 60) contain references to the "Taxpayers Network" or "TNI," a group through which the MedOne Choice policy in  *Addison* was offered.

15

Executive Risk argues that *Addison* and the other thirty-eight cases are Related Claims. The definition of Related Claims is broader than the language used in the prior and pending proceeding exclusion. Related Claims are those involving not only the "same" facts, circumstances, situations, transactions, events, or Wrongful Acts but also facts, circumstances, situations, transactions, events, or Wrongful Acts "related . . . logically, causally, or in any other way." It is not surprising, therefore, that courts have held that cases arising out of different wrongful acts can be related claims. In *Continental Cas. Co. v. Wendt*, 205 F.3d 1258 (11th Cir. 2000), for example, two different plaintiffs alleged that the insured had made different misrepresentations concerning the legality of investments in a certain company. The court held that the misrepresentations were related acts because they comprised "a series of actions all of which were intended to encourage investment in [the company]." *Id.* at 1263.

Nevertheless, some limits must exist on what claims may be considered related. The policies' definition of "Related Claims," like the prior and pending proceeding exclusion, is so broad that, taken literally, it is virtually devoid of content. Related Claims are those "related . . . in any . . . way." Claims might relate to one another in innumerable ways; probably any two or more claims could be related in *some* way, however trivial (*e.g.*, both being claims for money damages, both being made by American citizens, both being made on Wednesdays, etc.). As noted above in connection with the prior and pending proceeding exclusion, the Wisconsin Supreme Court has held that "[w]ords and phrases in an insurance policy are ambiguous when they are so imprecise and elastic as to lack any certain interpretation." *Whitbeck*, 654 N.W.2d at 230. By that standard, the policies' definition of "Related Claims" is ambiguous and must be narrowly construed against the insurer in an effort to meet the reasonable expectations of the insured.

16

Citing *Estate of Logan v. Northwestern National Casualty Co.*, 424 N.W.2d 179 (Wis. 1988), AMS argues that the Wisconsin Supreme Court has held that, in order to be considered "related" under such a provision, the claims must arise from a violation of the same duty and share the same cause. (Pls.' Resp. [92] at 18.) *Logan* held that a claim against an attorney for failing to timely file estate and inheritance tax returns on behalf of an estate was not related to claims against the same attorney for failing to file the fiduciary returns and properly to handle the assets of the same estate because the duties encompassed in the latter claim were separate from the duty to file the estate's tax returns, and the failure to do the former did not affect the ability to do the latter. *Id.* at 189. If claims by the same client against the same defendant in the same lawsuit arising out of the same representation are not related claims under Wisconsin law, AMS argues, then surely *Addison* and the other thirty-eight cases at issue here cannot be considered related. (Pls.' Resp. [92] at 19.)

But *Logan* involved policy language that differs substantially from the policy language at issue here. The policy in *Logan* defined related claims as those that "arise[ ] out of a single act, error, omission or personal injury or a series of related acts, errors, omissions or personal injuries . . . ." 424 N.W.2d at 188. Here, by contrast, the policy language is much broader. Claims under Executive Risk's policy are related if they are "based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions, or events" or related series thereof, "whether related logically, causally, or in any other way." Given the significantly broader language used to define "Related Claims" in the policy at issue here, the court concludes the *Logan* is not authoritative or even very helpful.

17

While neither party has cited a case directly on point, Justice Joyce L. Kennard of the California Supreme Court addressed an analogous situation in *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 855 P.2d 1263, 21 Cal. Rptr. 2d 691 (1993):

> There are any number of ways in which two acts giving rise to claims under a malpractice insurance policy might be said to be "related" in the general sense of the term. A law firm that has a single policy may commit, through two lawyers, two acts of malpractice affecting the same client on the same day. These claims could be said to be related in at least three ways: temporally (same day), thematically in one sense (same client), and thematically in another sense (two real estate matters involving boundary disputes). Accordingly, the two claims could reasonably be said to be "related" within the "general meaning" of the term. But it is unlikely, given that the acts of malpractice occurred in two separate matters, that the claims would be considered "related" within the meaning of the policy. Thus, the necessity arises to impose some limiting construction on the policy term "related acts or omissions." When the language of an insurance policy is ambiguous the courts look to the expectations of a reasonable insured.

*Id.* at 1276, 21 Cal. Rptr. 2d at 704 (Kennard, J., concurring). Here, too, the court must impose a limiting construction on the policies' definition of "Related Claims."

In *Gregory v. Home Ins. Co.*, 876 F.2d 602, 606 (7th Cir. 1989), the Seventh Circuit addressed this issue in the context of a class action against a brokerage company that had marketed an investment package designed to offer buyers certain tax benefits. When the IRS disallowed the deductions claimed by the buyers and assessed interest and penalties against them, the buyers sued the brokerage company and its attorney who had drafted several of the key documents for the investment program, as well as the tax and security opinion letter upon which the investors relied. The issue in *Gregory* was whether the various claims of the class members and the cross-claim of the brokerage company against the attorney were related such that the policy's single claim limit applied. The policy provided: "Two or more claims arising out of a single act, error, omission or personal injury or a series of related acts, errors, omissions or personal injuries shall be treated as

18

a single claim." *Id.* at 604.  In affirming the district court's conclusion that all of the claims were related within the meaning of this provision, the Seventh Circuit rejected the holding in *Arizona Property & Casualty Ins. Guar. Fund v. Helme*, 735 P.2d 451 (Ariz. 1987), that the meaning of the word "related" in that context should be limited to "causally" related.  Instead, the Court noted that "the common understanding of the word 'related' covers a very broad range of connections, both causal and logical," *id.* at 606, and held that either kind of relation could suffice:

> [W]e don't think the rule requiring insurance policies to be construed against the party who chose the language requires such a drastic restriction of the natural scope of the definition of the word "related."  Parties are generally free to include language of their choice in contracts, and courts should refrain from rewriting them.

*Id.*  The court concluded that while at some point "a logical connection may be too tenuous reasonably to be called a relationship," the facts of the case before it "comfortably fit within the commonly accepted definition of the concept."  *Id.*

This court reaches the same conclusion here and construes the related claims provision to require a causal or logical relationship in order for two or more claims to be found related.  With this understanding, the court further concludes that *Addison* and the other thirty-eight lawsuits are clearly "related" in any meaningful sense of the word.  What all of the lawsuits, several of which have been brought as class actions, have in common is that they are all based on AMS's practice of underwriting renewals of purported "group" health insurance policies based on its assessment of the individual group participant's or beneficiary's health risk.  They all flow from AMS' business decision to market and sell, as group health insurance, policies the premiums for which it increased on an individual basis according to its assessment of the health and claim history of the individual participant or beneficiary.  In this sense, each case is related, both causally and logically, to one

19

another. The relationship is obvious and direct; it is not so tenuous as to mislead a reasonable insured. The court therefore concludes that all of the claims are deemed a single claim made at the time AMS received notice of *Addison* during the term of the 1999-2000 policy. Any claims against Executive Risk based on the other two policies will be dismissed.

## III. The Definition of "Loss" and Other Exclusions

Executive Risk argues that even if the prior and pending proceeding exclusion does not serve as an absolute bar to all coverage in the cases at issue, many, if not all, of the damages sought by the plaintiffs do not fall within the policies' definition of "Loss." The policies define "Loss" as:

> Defense Expenses and any monetary amount which an Insured is legally obligated to pay as the result of a Claim. . . . Loss shall not include:
>
> . . .
>
> (2) fees, amounts, benefits or coverage owed under any contract, health care plan or trust, insurance or workers' compensation policy or plan or program of self-insurance;
>
> (3) non-monetary relief or redress in any form, including without limitation the cost of complying with any injunctive, declaratory or administrative relief; or
>
> (4) matters which are uninsurable under applicable law.

(Def.'s PFOF ¶ 13.) However, an endorsement to the Policies provides that "the term 'Loss' . . . is amended to include . . . any punitive or exemplary damages where insurable under applicable law." (*Id.*)

Executive Risk first argues that the exclusion for "fees, amounts, benefits or coverage owed under any contract, health care plan or trust, insurance or workers' compensation policy or plan or program of self-insurance" precludes indemnity coverage for many of the amounts AMS has agreed to pay in settlement of the various claims. It notes, for example, that in two of the cases the

20

plaintiffs allege that AMS failed to pay benefits to its insureds. (Def.'s Br. at 32.) Because the policy expressly excludes benefits owed under any contract or health care plan from the definition of loss, Executive Risk argues that coverage for these claims is not provided.

To the extent the lawsuits against AMS seek recovery of benefits owed under policies that were in effect at the time the claim was submitted, there is no coverage under the policy. But this would be the case for only a small portion of the damages claimed in the re-underwriting lawsuits. In the various lawsuits against AMS, it appears that few if any of the losses alleged consisted of unpaid benefits that were due under policies that were then in effect. The claim that all of the various lawsuits have in common is that AMS improperly increased their individual premiums for what it sold as a group insurance policy based upon its individualized assessment of their health and/or claims history. As a result, some of the insureds simply paid premiums substantially in excess of what would otherwise have been required. Others, however, could not afford the increased premiums, and the policies were allowed to lapse or were cancelled. (Borja Decl., [69] Ex. 9B ¶5.) For those who were unable to obtain new health insurance, the cost of the medical care they required thereafter would constitute an element of the damages flowing from the breach or other wrong. But it would not constitute unpaid benefits due under the policy since no policy was then in effect. The court therefore concludes that while some of the damages claimed may be excluded as unpaid benefits due under the various policies, most would not.

Executive Risk next argues that its policy provides no coverage for any amounts AMS expended in complying with the declaratory or injunctive relief obtained by the plaintiffs in the various lawsuits. As noted, the definition of Loss excludes coverage for "non-monetary relief or redress in any form, including without limitation the cost of complying with any injunctive,

21

declaratory or administrative relief." In the *Addison* settlement agreement, as well as several others, AMS agreed to take, or refrain from taking, certain actions. For example, in *Addison*, AMS agreed not to resume "tier rating" its MedOne Choice policies and to provide certain members of the plaintiff class an opportunity to purchase "any MedOne Choice policy currently being offered by AMS in Florida at current block, non-tier rated, rates." (Borja Decl., [69] Ex. 14 at 11.) Executive Risk contends that the cost of providing such relief is not a covered loss.

> AMS protests that the definition of "Claim" encompasses
>
> any written notice received by any Insured that a person or entity intends to hold an Insured responsible for a Wrongful Act. In clarification and not in limitation of the foregoing, such notice may be in the form of an arbitration, mediation, judicial, declaratory or injunctive proceeding.

But this only brings declaratory and injunctive proceedings within the "initial grant of coverage." *American Girl, Inc.*, 673 N.W.2d at 73. Once it is determined that a claim falls within the initial grant of coverage, the court then looks to the exclusions to see if any of them preclude coverage of the present claim. *Id.* Here, the exclusion unambiguously eliminates coverage for non-monetary relief, including the cost of complying with injunctive or declaratory relief awarded in such proceedings.

AMS next argues that the exclusion does not apply because no injunctive relief was ordered. But the exclusion is not limited to injunctive relief. It applies to all non-monetary relief. Moreover, AMS cannot avoid the effect of the exclusion by agreeing to undertake the very actions the plaintiffs seek to compel by injunction by entering into a settlement. To the extent that AMS agreed to undertake acts as part of the settlement agreement that would have taken the form of injunctive relief if the case had not settled, the cost of undertaking those acts is not covered. Thus, Executive

22

Risk has no obligation to pay AMS for the cost of providing non-monetary relief in *Addison* or any of the other suits.

Executive Risk also argues that a substantial portion of the damages for which AMS seeks indemnification are excluded from the policy's "profit, remuneration or advantage" exclusion. This exclusion states: "Except for Defense Expenses, [Executive Risk] shall not pay Loss from any Claim brought about or contributed to in fact by . . . any Insured gaining any Profit, Remuneration or Advantage to which such Insured was not legally entitled." (Def.'s PFOF [70] ¶ 18.) Even in the absence of a specific exclusion, coverage for what Executive Risk has characterized as AMS's "ill-gotten gains" would not be allowed. A party may not use insurance to put itself in a better position than it would have been absent its wrongdoing. While the definition of "Loss" includes "any monetary amount [AMS] is legally obligated to pay as the result of a Claim," courts have generally construed policy language to exclude coverage for "losses" that are restitutionary in nature. The policy in *Level 3 Communications, Inc. v. Federal Ins. Co.*, 272 F.3d 908 (7th Cir. 2001), for example, defined "loss" as "the total amount which any Insured Person becomes legally obligated to pay . . . including, but not limited to . . . settlements[.]" *Id.* at 909. The Seventh Circuit nonetheless held that definition did not include the insured's obligation to make restitutionary payments to the plaintiffs in the underlying suit, who had been induced by the insured's officers to sell stock to the insured at deflated prices. The court noted that the amount paid by the insured to the plaintiffs in settlement was merely "part of [the insured]'s gain from its officers' misbehavior." *Id.* at 911.

The policy in *Central Dauphin School Dist. v. American Cas. Co.*, 426 A.2d 94 (Pa. 1981), defined "Loss" to mean "any amount which the Assured . . . [is] legally obligated to pay" but

excluded "matters which shall be deemed uninsurable under the law pursuant to which this policy shall be construed." *Id.* at 95.  The court held that the policy provided no coverage for the insured school district's obligation to refund improperly-imposed taxes to taxpayers.  Otherwise, the court explained,

> a school district or any other taxing body would have little reason, if any, to enact only lawful taxing measures. A district would be able to subject its citizens to an unlawful tax measure like the one imposed here, and yet in effect retain the proceeds of the unlawful tax simply by recovering on the claimed insurance coverage.

*Id.* at 96.

Likewise in this case, AMS may not retain the benefits of its wrongdoing by making claims upon Executive Risk.  But unlike *Level 3* or *Central Dauphin*, there is no need to construe more general policy language so as to avoid coverage for such damages.  The profit, remuneration or advantage exclusion specifically applies.  In the Stipulation of Settlement of *Addison*, for example, AMS agreed to pay various class members a proportion of the "Excess Tier Rating Premiums," which are defined as "the excess amount of premiums a claimant paid for any and all policy years in which the premiums actually exceeded the amount such claimant would have paid with a 'Permitted Health Factor.'" (Borja Decl., [69] Ex. 14 at 9.)  Recovery of excess premium payments also represents a substantial portion of the damages sought in the other re-underwriting lawsuits. To the extent AMS is found liable for such damages, they clearly represent "profit, remuneration or advantage to which such insured was not legally entitled."

The same is true with respect to damages that reflect costs of medical care that AMS avoided when, as a result of its re-underwriting practices, an insured was required to cancel the policy or allow it to lapse.  Had it not been for AMS's wrongful acts, these claimants would have remained

Case 1:02-cv-01205-WCG   Filed 10/03/05   Page 24 of 30   Document 108

its insureds and AMS would have been responsible for paying for such care under the terms of its policy. Under the *Addison* Settlement Agreement, AMS agreed to pay certain class members a portion of "Claims Payments Lost," which are defined under the agreement as "the total of claims dollar benefits that would have been paid under the Most Similar Policy, minus the amount of claims dollar benefits actually paid under reduced coverage," from which are then subtracted "Premiums Saved," which are "the amount of premium that would have been paid by the Claimant under the Claimants' Most Similar Policy, minus the premium such Claimant actually paid for the coverage." (Borja Decl., [69] Ex. 14 at 5, 10.) A substantial portion of these amounts would be excluded from coverage under the "profit, remuneration and advantage" exclusion.[10] To the extent the other re-underwriting cases seek recovery of such amounts, they also would be excluded from coverage. The clear language of the policy, as well as the more general public policy considerations underlying cases such as *Level 3*, compel this result.

This is true notwithstanding the decision of the Florida District Court of Appeal in *United Wisconsin Life Insurance Co. v. Office of Insurance Regulation*, 849 So.2d 417, (Fla. 2003), which AMS claims vindicated its underwriting practices. In fact, it did no such thing. The Florida court

_____

[10]All of the amounts paid as "Claims Payments Lost" to those claimants who had no coverage after their AMS policies lapsed or who purchased policies with less generous coverage from AMS would fall within the "profit, remuneration or advantage" exclusion. But some of the claimants whose insurance with AMS lapsed purchased new coverage with other health insurers. Under the formula agreed to in *Addison*, AMS may be required to pay to such claimants an amount in excess of any profit AMS received from cancellation of the policy. For example, a claimant who under AMS's Most Similar Policy would have received benefits totaling $10,000 in return for premiums paid of $10,000 saved AMS nothing by cancelling his policy. But if he then purchased new insurance for the same premium and received benefits of only $9,000, he would be entitled to recover from AMS 80% of the Claims Benefits Lost or $800 (80% of the Claims Benefits that would have been paid under the Most Similar Policy, $9000, minus the Claims Benefits actually paid, $8,000). (Borja Decl., [69] Ex. 14 at 10.) Such amounts would not fall within the "profit, remuneration and advantage" exclusion and would be covered.

declined to address the question of whether AMS's tier rating practice violated Florida law because AMS was not given reasonable notice of the statute it was alleged to have violated. *Id.* at 422. But even if the Florida court had addressed the issue, it would not control here. The exclusion applies to "profit, remuneration or advantage to which the insured was not legally entitled." In all of the re-underwriting cases, AMS is alleged to have received premiums to which it was not legally entitled and avoided paying benefits it should have paid. To the extent the various settlements reflect payments by AMS for such amounts, they are not covered by the pertinent policy.

Coverage does exist, however, for losses that do not fall within these exclusions. Although there is no coverage for the cost of the non-monetary relief and most of the payments AMS has agreed to provide to the members of the plaintiff class in *Addison*, AMS has also agreed as part of the Settlement to pay the attorneys fees for the plaintiff class. Neither party has addressed whether these fees would be covered losses under the policy. Moreover, several of the other lawsuits allege damages clearly covered under the policy. Some of the damages sought by the plaintiffs in *Saucier* (Borja Decl., [69] Ex. 18), *McLeod* (Borja Decl., [69] Ex. 17), *Hicks* (Borja Decl., [69] Ex. 41), *Fabritis* (Borja Decl., [69] Ex. 44), and *Lockett* (Borja Decl., [69] Ex. 49) amount to more than just an attempt to recoup profit, remuneration, or advantage obtained by AMS. All these cases allege, for instance, that the plaintiffs suffered damages in the form of "mental anguish" or the equivalent. *See McLeod*, Compl. ¶ 18 ("As a proximate result [of AMS' fraud], Plaintiff has been caused to suffer actual damages and mental anguish and will suffer such damages in the future."); *Saucier*, Compl. ¶ 87 (same); *Hicks* ¶ 18 (same); *Fabritis*, Compl. ¶ 29 ("As a proximate result of [AMS'] fraud, Plaintiff . . . has suffered mental anguish and emotional distress and will continue to do so . . . ."); *Lockett*, Compl. ¶ 29 (same). Additionally, the plaintiffs in each case sought punitive

26

damages, for which the policies explicitly provide indemnity coverage. (Borja Decl., [69] Exs. 4-7, "Endorsement No. 6.") It therefore follows that coverage does exist for at least a portion of the claims made in those cases and Executive Risk's motion for summary judgment dismissing AMS's claim in its entirety must be denied.

## IV. Defense expenses

Endorsements issued for each of the policies provided that AMS had "the right and duty to defend any Claim and to retain qualified counsel of their choosing to represent them in the defense or appeal of Claims . . . ." (Def.'s PFOF [70] ¶ 15.) The policies included "Defense Expenses" as part of the "Loss" Executive Risk agreed to pay in the event of a claim. "Defense Expenses" are defined as "reasonable legal fees, costs, and expenses incurred in the investigation, adjustment, defense, or appeal of a Claim; but Defense Expenses shall not include remuneration, salaries, overhead, fees, or benefit expenses of any insured." (Summers Aff., [80] Exs. 1, 2, 3, and 4 at 2.) The policies further provide:

> The Underwriter will, upon written request, pay Defense Expenses owed under this Policy on a current basis. As a condition of any payment of Defense Expenses before the final disposition of a Claim, the Underwriter may require a written undertaking on terms and conditions satisfactory to it guaranteeing the repayment of any Defense Expenses paid on behalf of any Insured if it is finally determined that this Policy would not cover Loss incurred by such Insured in connection with such Claim. Except for Defense Expenses paid in accordance with this CONDITION D(2), the Underwriter will have no obligation to pay any Loss before the final disposition of a Claim. If some, but less than all, of the allegations in any Claim give rise to any Loss for which this Policy provides coverage, the Insureds and the Underwriter shall use their best efforts to arrive at a fair and appropriate allocation of any fees, costs and expenses and settlement amounts based on relative exposure incurred in connection with such Claim.

(Def.'s PFOF [70] ¶ 15.)

27

In January 2002, Executive Risk paid AMS $797,033.97 for legal expenses it had incurred in defense of the *Addison* case. In its counterclaim against AMS, Executive Risk now seeks reimbursement of the full amount it advanced on the ground that it had no duty to pay AMS its expenses for defense of the *Addison* case. Executive Risk also seeks a determination that it had no obligation contemporaneously to pay AMS its defense expenses in any of the thirty-eight other lawsuits because AMS refused its request for a written undertaking to repay Executive Risk in the event it was later determined the loss was not covered. Claiming that the material facts are undisputed as to both issues, Executive Risk seeks summary judgment on its counterclaim against AMS.

AMS, on the other hand, argues that Executive Risk waived any right it may have had to reimbursement of the defense expenses because it failed to request a written undertaking guaranteeing repayment as a condition of making the payment. But even if it had not waived its rights, AMS argues that Executive Risk's claim must be denied because the undisputed facts establish that Executive Risk was required to pay AMS defense expenses for *Addison*, as well as the thirty-eight other re-underwriting lawsuits. AMS also claims that Executive Risk never requested a written undertaking as a condition to paying defense expenses in the thirty-eight other suits. Thus, it opposes Executive Risk's argument that it is entitled to summary judgment on AMS's claim that Executive Risk breached the contract by failing to pay defense expenses for those claims on a current basis. Finally, AMS contends that Executive Risk's argument that it was relieved of its obligation to pay defense costs because AMS refused to provide a written undertaking is moot since the right to demand a written undertaking only exists if expenses are advanced "before the final disposition of a Claim." Since it has already resolved many of the claims, including

28

*Addison*, AMS argues that Executive Risk's right to demand a written undertaking no longer applies.

The fact that Executive Risk did not request a written undertaking from AMS guaranteeing repayment does not defeat Executive Risk's right to recover such expenses in the event it is later determined they were not owed under the policy. Although the policy allowed Executive Risk to demand a written undertaking guaranteeing repayment as a condition of payment, nothing in the policy limits its right to recover such expenses to cases in which an undertaking has been given. Executive Risk advanced expenses to AMS under the belief that they were owed under the policy. If Executive Risk was mistaken in that regard, it may be entitled to recover them under a theory of unjust enrichment. *See Sulzer v. Diedrich*, 664 N.W.2d 641, 645-46 (Wis. 2003). Because Executive Risk consistently reserved its rights under the policy with respect to *Addison*, the court concludes no waiver of any right Executive Risk may have to recover expenses advanced by it has occurred. Accordingly, AMS's motion for summary judgment dismissing Executive Risk's counterclaim will be denied.

At the same time, it is also clear that Executive Risk is not entitled to summary judgment on its counterclaim in its favor. From the court's previous conclusion that some of the allegations against AMS in the various lawsuits against it gave rise to losses covered by the policy, it follows that Executive Risk is required to pay some of the defense expenses incurred by AMS in the investigation, adjustment and defense of the various lawsuits. Even as to claims that resulted in losses excluded under the "profit, remuneration, or advantage" exclusion, Executive Risk is still required to pay defense expenses, since they are explicitly excepted from the exclusion. Since this would apply to most of the losses AMS agreed to pay in the *Addison* settlement, it appears that Executive Risk is responsible for a substantial portion of the defense expenses in that case. Other

29

losses, however, such as benefits due under the policies or the cost of non-monetary relief, do not fall within the policy definition of loss and so the defense expenses attributed to them would not be covered.

Under these circumstances, the policy provides that the parties "shall use their best efforts to arrive at a fair and appropriate allocation of any fees, costs and expenses and settlement amounts based on relative exposure incurred in connection with such Claim." (Def.'s PFOF ¶ 15.) In the event they are unable to reach agreement on such an allocation, it becomes the duty of the court to determine a proper allocation. The record, as it now stands, does not permit the court to make such an allocation. Accordingly, the court can only conclude that Executive Risk is liable to AMS under the 1999-2000 policy for a portion of the losses, including defense expenses, sustained by AMS.

## CONCLUSION

In accordance with the foregoing, the court grants summary judgment to AMS on its claims for breach of contract and declaratory relief on the 1999-2000 policy. Executive Risk's motion for summary judgment is granted with respect to all other policies, and all claims made under those policies are dismissed. In all other respects, both parties' motions are denied. The clerk shall set this matter on the calendar for further proceedings within next thirty days. Counsel shall appear in person.

**SO ORDERED**.

Dated this   30th   day of September, 2005.


 s/ William C. Griesbach
William C. Griesbach
United States District Judge

30